UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KEVIN MEYERSBURG,                                          :
                                                          :
                           Plaintiff,                     :
                                                          :
              -against-                                   :          **COMPLAINT**
                                                          :
MORGAN STANLEY & CO. LLC,                                  :
                                                          :
                           Defendant.                     :
------------------------------------------------------------------------X

Plaintiff Kevin Meyersburg ("Plaintiff" or "Meyersburg"), by his attorneys Pechman Law Group PLLC, complaining of unlawful discrimination by Defendant Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Firm"), alleges:

## NATURE OF THE ACTION

1.     During his tenure as Morgan Stanley's Managing Director and Head of Executive Services, Meyersburg developed an impressive list of achievements, including creating and spearheading Executive Services Partner Referral Programs that resulted in over 3,000 new wealth management accounts and $5 billion in wealth management assets under management for the Firm.

2.     Under his leadership, the Firm's Executive Services team grew from fifty to 330 employees, nearly tripled in budget size, and played a pivotal role in generating profits for Morgan Stanley during a period when other divisions struggled to be profitable.

3.     In approximately April 2023, Morgan Stanley began announcing a series of layoffs as a result of the Firm's recent financial underperformance.   The Firm implemented the majority of the layoffs by combining and collapsing similar teams.

4.      Given its pivotal profit-making role and strong performance, Morgan Stanley did not target Meyersburg's Executive Services team for elimination nor did it lay off a significant number of employees from the Executive Services team.

5.      However, despite his documented strong performance and the success of the Executive Services team under his leadership, Morgan Stanley informed Meyersburg on May 11, 2023 that he was being terminated and replaced in the Managing Director role that he had held for nearly three years with a Black female with significantly less experience and qualifications for the position.

6.      Morgan Stanley did not point to any deficiency in Meyersburg's work performance or otherwise in justifying his termination and replacement.  Instead, Morgan Stanley's decision to terminate Meyersburg, a White male, and replace him with a Black female, was the result of the Firm's attempt to comply with its Diversity and Inclusion objectives.   In other words, Morgan Stanley unlawfully terminated Meyersburg's employment because of his sex, race, and/or color.

7.      Meyersburg brings this action seeking declaratory and injunctive relief, reinstatement, and monetary damages to redress Defendant's unlawful discrimination against him on the basis of his sex, race, and/or color (White), in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code § 8-101 *et seq.* ("NYCHRL").

**JURISDICTION**

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this is a civil action arising  under Section 1981. This Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 28

U.S.C. § 1367.  The Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00.

**VENUE**

9.      Pursuant to 28 U.S.C. § 1391, venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendant resides in this District.

**NOTICE**

10.      Withing ten days of the filing of this Complaint, Plaintiff will serve a copy of the Complaint on the New York City Commission on Human Rights and the New York City Corporation Counsel, thereby satisfying the notice requirements of N.Y.C. Admin. Code § 8-502.

**THE PARTIES**

**Plaintiff Kevin Meyersburg**

11.      Meyersburg resides and is domiciled in Bergen County, New Jersey and is a citizen of New Jersey.

12.      Meyersburg was employed by Morgan Stanley as a Managing Director and Head of Executive Services from approximately October 2020 (following Morgan Stanley's acquisition of E*TRADE in February 2020) until his termination, effective August 15, 2023.

**Defendant Morgan Stanley & Co. LLC**

13.      Morgan Stanley & Co. LLC is a Delaware limited liability company whose principal place of business and headquarters are located at 1585 Broadway, New York, New York 10036.

14.     Morgan Stanley is an investment management company offering wealth management, capital markets, investment banking, research, trading, recapitalizations, equities valuations, and financial advisory services to customers worldwide.  Morgan Stanley employs over 80,000 people and reported second quarter 2023 revenues of approximately $13.5 billion.  *See*  https://www.morganstanley.com/about-us-ir/shareholder/2q2023.pdf (last accessed August 28, 2023).

### FACTUAL ALLEGATIONS

**Meyersburg's Professional Background and Position at Morgan Stanley**

15.     Meyersburg is a White male with over twenty-six years of experience in successfully managing financial relationships with clients and building businesses to address the needs of high net worth clients.

16.     Meyersburg holds a Bachelor's Degree in Finance from Manhattan College and a Master's Degree in Business Administration and Finance from Fordham University.

17.     Meyersburg began his career in 1997 at Donaldson Lufkin Jenrette as Manager, High Net Worth Group before the investment bank was acquired by Credit Suisse in 2000.

18.     Following the acquisition by Credit Suisse, Meyersburg remained in the same role with the title Director, High Net Worth Group until his branch was acquired by Bank of Montreal/Harris Bank in 2002.

19.     At Bank of Montreal/Harris Bank, Meyersburg remained in the same role with the title Vice President, High Net Worth Relationship Group until his branch was acquired by E*TRADE Financial Corporation in 2005.

20.     At E*TRADE Financial Corporation ("E*TRADE"), Meyersburg first served as Director, Platinum Client Group.  In 2007, E*TRADE promoted Meyersburg to Vice

President, Private Client Group, and in 2019 again promoted him to Senior Vice President, Institutional Services Group, where he was responsible for the Executive and Participant Services, Designated Brokerage, 10b5-1, and the Registered Investment Advisor Service and Relationship Management teams.

21.     At E*TRADE, Meyersburg was able to succeed where others had not.  In June 2016, E*TRADE asked Meyersburg to take over the failing Executive Services and Stock Plan Services divisions, including the 10b5-1 team—responsible for drafting, managing, and reporting 10b5-1 trading plans for Stock Plan Executives—and the Designated Brokerage team.

22.     By June 2019, Meyersburg had developed a new Executive and Stock Plan service model and reversed years of large losses and regulatory issues within the 10b5-1 team.  E*TRADE again promoted Meyersburg and gave him a salary increase despite generally challenging financial conditions at E*TRADE.

23.     Morgan Stanley announced the acquisition of E*TRADE in February 2020 and Meyersburg became the Managing Director and Head of Executive and Participant Services at Morgan Stanley, where he was responsible for both running the legacy Executive Services and Stock Plan Services teams from E*TRADE and for pushing the acquisition integration efforts for Executive and Participant Services, 10b5-1, and Designated Brokerage teams encompassing approximately 2.2 million clients.

24.     During the acquisition, Meyersburg was key to integration efforts, partnered with leadership from Morgan Stanley's Stock Plan Services team, and held weekly meetings with the leadership of the Morgan Stanley at Work division (where the Equity Compensation, Stock Plan, 10b5-1, and Restricted Securities divisions reside) and monthly meetings with the Head of Morgan Stanley's Workplace Solutions Group Jaimie

Sobrepera.  Meyersburg also continued to run the legacy Participant Services team from E*TRADE.

25.     In March 2020, Morgan Stanley offered Meyersburg a $760,000 retention agreement recognizing his participation in all integration efforts for his division upon the successful close of the acquisition in October 2020 and provided Meyersburg with the retention bonus when it closed the acquisition of E*TRADE in October 2020.

26.     Simultaneously, between February 2020 and July 2021, Meyersburg also began developing an innovative Executive Services Partner Referral Program (the "Partner Referral Program"), which sought to improve the client experience with referrals within the Wealth Management divisions by partnering Executive Service Relationship Managers with Morgan Stanley Financial Advisors.

**Meyersburg's Success at Morgan Stanley**

27.     In June 2020, as part of the acquisition and integration, E*TRADE's 10b5-1 and Designated Brokerage teams, which Meyersburg had overseen at E*TRADE, were merged into Morgan Stanley's Corporate Brokerage Solutions and Executive Financial Services group, overseen by Marc McDonough, Head of Corporate Brokerage Solutions.

28.     In March 2021, Scott Whatley, Morgan Stanley's Managing Director and Global Head of Equity Solutions, reached out to Meyersburg to express his discontent with the assignment of the 10b5-1 teams to McDonough given how successful Meyersburg had been in turning around the 10b5-1 business at E*TRADE.  Whatley also advised Meyersburg that losses in the 10b5-1 division under McDonough's leadership has caused major issues with several large corporate clients, with losses from 10b5-1 errors exceeding $1.5 million annually with no sign of improvement.

29.     Whatley informed Meyersburg that Whatley had spoken with Jed Finn, Morgan Stanley's Head of Corporate and Institutional Services, to recommend that

Meyersburg run the 10b5-1 division, and that Whatley had told Finn that Meyersburg was a good choice for the role because he had a documented track record of running this business successfully.

30.     In June 2021, Brian McDonald, Head of Morgan Stanley at Work, informed Meyersburg that he would be taking over Corporate Brokerage Solutions and leading the merged Executive Service, 10b5-1, and Designated Brokerage teams from E*TRADE and Corporate Brokerage Solutions, Executive Financial Services, and Designated Brokerage teams from Morgan Stanley. At this point, Meyersburg's title at Morgan Stanley became Managing Director and Head of Executive Services.

31.     McDonald informed Meyersburg that while he believed that Meyersburg' track record of success made him the right choice to manage the Stock Plan Participant Services (a/k/a Participant Services) team, which deals with individuals with a portfolio of assets of under $750,000, McDonald did not have the political capital at the time to keep that team under Meyersburg's leadership, and the Participant Services team from E*TRADE would therefore be merged with its Morgan Stanley counterpart under the leadership of Sobrepera.

32.     McDonald also asked Meyersburg to continue developing and building on his existing Partner Referral Program and tasked him with cleaning up the 10b5-1 and Designated Brokerage teams' errors and regulatory issues.

33.     In August 2021, Meyersburg and McDonald met with Finn to make a presentation on the innovative Partner Referral Program that Meyersburg had developed.  Finn approved a pilot for the Partner Referral Program and a new incentive compensation plan for the Executive Service Relationship Managers.

34.     The first wave of the Partner Referral Program was implemented in October 2021, with eight Executive Service Relationship Managers and eight Morgan Stanley

Financial Advisors.  Initial results in January 2022 were very positive, with Meyersburg's Partner Referral Program nearly doubling the conversion rates of Morgan Stanley's previous referral program from approximately 14% to 26%.

35.     Due to the first wave's success, a second wave of the Partner Referral Program was launched with an additional fifteen Executive Service Relationship Managers and Morgan Stanley Financial Advisors.

36.     In January 2022, Meyersburg had an annual compensation discussion with McDonald.

37.     McDonald informed Meyersburg that, based on his performance, his base salary would be increased from $240,000 to $400,000 and he would receive a bonus of an additional $400,000.

38.     McDonald also informed Meyersburg that his raise was highly unusual given financial pressures at the Firm but was a result of Morgan Stanley's recognition of his outstanding performance and the importance of his business to the Firm's results.

39.     McDonald also told Meyersburg that he expected Meyersburg to reach a total compensation of over $1,000,000 in 2023 given Meyersburg's trajectory, that it was one of McDonald's goals to get Meyersburg to that compensation level, and that McDonald did not see anything holding Meyersburg back from reaching that compensation level.

40.     In February 2022, Meyersburg presented Finn with an update on the Partner Referral Program's metrics.  Finn pressed for further growth and scale of the Partner Referral program due to its success and sought input from Meyersburg on strategies to grow the Partner Referral Program even faster, which Meyersburg provided.

41.     In April 2022, the 10b5-1 team under Meyersburg's leadership finished its first quarter with zero errors and reported that previous issues with corporate clients were resolved and that key clients had been retained.

42.     Concurrently, based on its success, Meyersburg's Partner Referral Program exited its pilot phase.

43.     In May 2022, Morgan Stanley cancelled a previously planned internal deep-dive audit for Meyersburg's line of business based on evidence of its effective oversight and supervision on its initial review of the Executive Services, 10b5-1 and Designated Brokerage teams.

44.     In July 2022, Finn approved Meyersburg's recommendations from February 2022 regarding expansion of the Partner Referral Program and Morgan Stanley added eighty-two new Executive Service Relationship Managers and support staff to the Partner Referral Program, doubling the total headcount to 160.

45.     In September 2022, Meyersburg made a presentation to Finn demonstrating the continued success of the Partner Referral Program.  Finn again inquired about expanding the Partner Referral Program and Meyersburg provided Finn with additional recommendations on how to grow the Partner Referral Program.

46.     In fact, the Partner Referral Program was so successful that in October 2022 McDonald informed Meyersburg that while Morgan Stanley was undertaking an analysis to seek cost savings by combining similar customer service teams, Meyersburg's Executive Services team would not be targeted for cost reductions due to its importance and strong performance in comparison to other Morgan Stanley divisions and because there was no other similar business within Morgan Stanley that it could be combined with.

47.     In December 2022, the Partner Referral Program closed the year with nearly a 30% conversion rate alongside a total $1.8 billion in closed referrals, with nearly zero errors and no regulatory issues.  The performance of Meyersburg's Executive Services team exceeded all other Morgan Stanley divisions with respect to converting prospective clients to wealth management clients.

48.     Morgan Stanley allocated Meyersburg's Executive Services team a $2.2 million budget for technology and product build in 2022.

49.     Due to the growth and performance of Meyersburg's Executive Services team, Morgan Stanley requested a $7 million budget for the team in 2023.

50.     Morgan Stanley ultimately allocated a $6.4 million technology budget to Meyersburg's Executive Services team for 2023 based on its performance in 2022 and its importance to the Firm's overall business.

51.     All other Morgan Stanley teams experienced a decline in their technology budgets for 2023.

52.     Morgan Stanley leadership informed Meyersburg that the Executive Services team was prioritized based on its performance, with other teams reallocating portions of their own technology budgets to Meyersburg's for 2023.

53.     In January 2023, Finn also approved Meyersburg's recommendations on the continued expansion of the Partner Referral Program as discussed in September 2022 and Morgan Stanley added fifty additional Executive Service Relationship Managers and support staff to the program.

54.     In January 2023, Meyersburg held his annual compensation meeting with McDonald.

55.     McDonald told Meyersburg that his total compensation for 2023 would remain flat amidst a challenging year for Morgan Stanley as a whole, but that this was a

very positive reflection on his performance comparatively as Morgan Stanley had reduced the compensation of other Managing Directors, in some cases sharply.

56.     During the meeting, Meyersburg asked for feedback on his performance. McDonald responded by telling Meyersburg to "keep going," and informed Meyersburg that his was the only team that had almost tripled in size both in headcount and technology budget.

57.     McDonald stated that he had no negative feedback for Meyersburg and that Meyersburg had the full and complete support of management, as evidenced by the growth of both the headcount and technology budgeted for his team.

58.     Upon further review of his compensation statement, Meyersburg realized that his bonus had been decreased by 30% from the prior year and scheduled a meeting with McDonald to discuss the decrease in order to confirm that it was not reflective of any issues with his job performance.

59.     At the meeting, Meyersburg informed McDonald that he wanted McDonald to be very direct with him about his performance as he was concerned that a 30% decrease in his bonus might be indicative of a performance issue.

60.     McDonald assured Meyersburg that he was one of the Managing Directors least impacted by the Firm's cost-cutting and that he had fared much better than other Managing Directors with respect to his compensation package.

61.     Meyersburg again pushed McDonald for feedback about his performance. McDonald provided him with the same positive feedback as in their prior meeting, informed Meyersburg that Morgan Stanley was highly committed to him, and reiterated that no other Morgan Stanley team had experienced any budget growth at all while Meyersburg's Executive Services team had tripled in headcount and technology budget.

62.     Between February 2023 and May 2023, Meyersburg's Partner Referral Program's referral rates continued to rise in scale, close rates, and total value.  During a February 2023 meeting with McDonald, McDonald told Meyersburg that Morgan Stanley needed him more than ever.

63.     In March 2023, Morgan Stanley's Internal Finance team delivered a revenue analysis to McDonald, showing that all teams under McDonald's purview were underperforming with respect to revenue, with the exception of Meyersburg's Executive Services team, which was outperforming with respect to year-over-year revenue growth.

64.     In April 2023, Meyersburg's Executive Services team accounted for the majority of closes for the month amongst all referral programs, accounting for 51% of all closed assets.  His team additionally experienced back-to-back weeks of over 250 leads and $150 million in closed assets, setting a new record for Executive Service Relationship Managers.

**Morgan Stanley's Diversity and Inclusion Initiatives**

65.     Morgan Stanley champions a variety of Diversity and Inclusion ("D&I") objectives, implemented through the Firm's Institute for Inclusion, which is responsible for setting policy, tracking metrics, coordinating internal and external voices, and overseeing the mentoring, development, and promotion of diverse employees.

66.     Morgan Stanley advocates for diversity throughout its workforce, providing insight on its practices through its 2021 Diversity and Inclusion Report, which includes the following representations:

> Our senior leadership teams are responsible for embedding the strategy, and for taking actions that will improve diversity representation and drive a culture of inclusion and belonging.

> We believe a diverse workforce brings diversity of thought and deepens our ability to serve our clients, investors and shareholders. We are committed to improving representation through targeted recruitment,

development and retention of our employees at all levels and in all divisions across the Firm.

Investing in the development and advancement of our employees is a key part of our strategy. From onboarding through promotions to senior levels, we support diverse employees along their career journeys through individualized support and programmatic offerings.

Our performance and rewards practices reinforce the Firm's culture and values. Year-end evaluations assess each employee's performance, conduct and contributions to our culture and reflect feedback from managers, direct reports and peers. This feedback is a critical input to both pay and promotion.

We regularly review representation, hiring, promotion, attrition, compensation and other key data, and leverage that data to identify gaps, shape our strategy and goals, and evaluate progress against those goals.

We are committed to improving representation among groups that have been historically underrepresented in our workforce. Establishing objectives not only helps us drive progress towards our goals, but also aligns with our newest core value, Commit to Diversity and Inclusion, and strengthens our dedication to transparency and accountability.

In 2020, we committed to review each of our core talent processes to ensure that we had maximized opportunities for all employees, particularly women and persons of color, and adopted best practices at each critical junction in the employee experience.

Continue to offer targeted development programs for underrepresented groups. Ensure diverse talent has support, access and opportunities to advance at the Firm.

*See* MORGAN STANLEY 2021 DIVERSITY AND INCLUSION REPORT (available at

https://www.morganstanley.com/assets/pdfs/2021-diversity-and-inclusion-

report.pdf) (last accessed August 21, 2023).

67.     Meyersburg was an active supporter of the Firm's D&I efforts as an

employee and leader.  For example, Meyersburg partnered with Morgan Stanley's

Executive Director and the D&I Officer for Corporate and Institutional Solutions Christyl

Lucille Murray to run a program on Inclusive Leadership and was in the process of

organizing another program with the Firm's D&I Office prior to his termination.

68.     Meyersburg's Executive Services team also scored the highest among Morgan Stanley At Work's businesses on the annual Employee Engagement Survey, which includes confidential feedback from all employees about leadership's commitment to the Firm's core values, including its D&I objectives.

69.     In around April 2023, and as a result of the Firm's recent financial underperformance, Morgan Stanley tasked Meyersburg with creating a list of employees in non-core businesses under his management to terminate based on predetermined performance metrics.   Meyersburg provided his list to Morgan Stanley's Human Resources department.

70.     Morgan Stanley's Human Resources department rejected the termination of four employees on Meyersburg's list, one of whom was a 25-year tenured female and two of whom were diverse candidates.

71.     McDonald informed Meyersburg that, although these individuals' performance metrics and positions in non-core businesses met the criteria for termination, the Firm had rejected the recommendations for the terminations because of the individuals' status as diverse candidates.

**Meyersburg's Termination**

72.     On May 5, 2023, McDonald and Meyersburg had a telephone call during which Meyersburg inquired about the Firm's cost reductions through the merging of the Firm's similar businesses.

73.     During the call, McDonald stated that Meyersburg's business would not be impacted by cost reductions due to its importance and the outperformance of Meyersburg's Executive Services team.

74.     McDonald also informed Meyersburg that Morgan Stanley would implement the majority of layoffs under the cost reduction initiative by folding divisions

together and combining similar teams from E*TRADE and Morgan Stanley.  Since Morgan Stanley did not have an Executive Services team prior to the acquisition of E*TRADE, McDonald told Meyersburg that there was nothing to combine with respect to his team.

75.    Meyersburg inquired about his own performance, and McDonald once again assured Meyersburg that his performance was great and that there were no concerns.

76.    On May 8, 2023, McDonald scheduled an in-person lunch with Meyersburg for May 11, 2023.

77.    At the lunch, Meyersburg asked about upcoming workforce reductions at Morgan Stanley, and McDonald stated that Meyersburg's Executive Services team was too important to Morgan Stanley overall and would not be combined with other teams.

78.    As the lunch progressed, McDonald told Meyersburg that he had to let go of most if not all of the Wellness Team due to its underperformance under its Managing Director.

79.    Immediately following this statement, however, McDonald told Meyersburg that Morgan Stanley had decided that the Financial Wellness Team's Managing Director—a Black female—would replace Meyersburg as Managing Director of the Executive Services team.

80.    Confused and bewildered, Meyersburg asked McDonald what the change meant for him.  Meyersburg assumed that he would at least be moved into a different role at Morgan Stanley given that he had effectively built the Executive Services team from the ground up, led its unprecedented performance in recent years, and pioneered the innovative Partner Referral Program with outstanding results.  McDonald proceeded

to inform Meyersburg that Morgan Stanley was terminating his employment and replacing him with the Financial Wellness Team's Managing Director.

81.     Meyersburg asked McDonald what he could have done differently to keep his position.  McDonald informed Meyersburg that the termination decision was not based on his performance but could not explain to Meyersburg why the decision had been made, and instead simply shrugged his shoulders.

82.     McDonald told Meyersburg that he was concerned about the individual that Morgan Stanley had selected to replace him because she did not have experience with or an understanding of the Executive Service team's business model and would need a lot of help.  McDonald even asked Meyersburg if he would be willing to help his replacement during the transition, an invitation that Meyersburg declined.

83.     Adding insult to injury, McDonald also told Meyersburg at the lunch that the Partner Referral Program had become so successful that despite layoffs across Morgan Stanley, the Firm was *adding* another thirty-five Executive Relationship Managers to the Executive Services team.

84.     On May 12, 2023, Meyersburg received several calls from colleagues that had heard about and were also bewildered by his termination and each of them opined that the decision was based on the Firm's D&I targets.

85.     During one such call with Whatley, Meyersburg informed Whatley that he did not understand why the Firm had terminated his employment.  Whatley assured Meyersburg that he had done everything right and that Whatley had told McDonald that Whatley was unhappy with the Firm's selection of his replacement given her lack of experience in a role that was critical to Morgan Stanley's business. When Meyersburg reiterated that he still did not understand why he had been terminated, Whatley replied that it was because of D&I initiatives.

16

86. On May 17, 2023, Morgan Stanley provided Meyersburg with a Change of Employment Status and Release Agreement (the "Agreement") advising that Meyersburg's active employment with the Firm would terminate on May 17 and that his termination would become fully effective August 15, 2023. Under the Agreement, Morgan Stanley offered Meyersburg $23,077 in severance pay.

87. Meyersburg declined to sign the Agreement.

88. On information and belief, Meyersburg is the only Managing Director that Morgan Stanley has replaced since May 2023.

**Meyersburg's Replacement**

89. Morgan Stanley replaced Meyersburg with a Black female who had worked as the Managing Director and Head of Morgan Stanley's Financial Wellness team since 2019 (the "Wellness Director").

90. While the Wellness Director may be a talented corporate executive, she simply did not have comparable levels of experience or background in the work performed by the Executive Services team to justify Morgan Stanley's decision to terminate Meyersburg's employment and replace him with the Wellness Director.

91. For example, as Managing Director of the Financial Wellness team, the Wellness Director had delivered digital financial education and basic financial planning programs to individuals with asset portfolios of $250,000 or less, far less than clients served directly in person by the Executive Services team who have asset portfolios of $750,000 or more.

92. The Wellness Director had overseen a team of less than twenty-five employees, whereas Meyersburg had overseen a team of 330 employees as Managing Director of the Executive Services team.

93.     The Wellness Director had approximately ten years of relevant industry experience when the Firm selected her as Meyersburg's replacement, whereas Meyersburg had twenty-six years of industry experience.

94.     The Wellness Director did not have any experience managing a 10b5-1 business—a critical component of the Executive Services team's work—when the Firm selected her as Meyersburg's replacement, whereas Meyersburg had seven years of experience managing a 10b5-1 business.

95.     The Wellness Director received Financial Industry Regulatory Authority ("FINRA") approval as a General Securities Representative in 2015, whereas Meyersburg received FINRA approval as a General Securities Representative in 1996.

96.     Morgan Stanley drastically reduced the size of the Financial Wellness team's staff in 2023 due to its underperformance under the management of the Wellness Director, whereas Morgan Stanley nearly tripled the size of the Executive Service team's staff during the three years that Meyersburg managed the Executive Services team due to its outstanding performance and profitability.

97.     As recently as March 2023, the Wellness Director asked Meyersburg to have a member of the Executive Services team make a presentation to the Wellness Team as the Wellness Director was unfamiliar with the Executive Service team's model but was aware of its successes.

98.     Morgan Stanley's decision to terminate Meyersburg's employment and replace him with the Wellness Director was not based on any legitimate non-discriminatory factors related to Meyersburg's performance or otherwise.

99.     Instead, Morgan Stanley terminated Meyersburg's employment and replaced him with the Wellness Director because of Meyersburg's sex, race, and/or color as a result of the Firm's efforts to achieve its D&I initiatives.

## FIRST CLAIM
### (Section 1981 – Race Discrimination)

100.    Plaintiff repeats and incorporates all foregoing paragraphs by reference.

101.    Defendant discriminated against Plaintiff on the basis of his race and/or color in violation of Section 1981 by denying Plaintiff equal terms and conditions by, *inter alia*, terminating his employment because of his race and/or color as described herein.

102.    As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer emotional distress, including embarrassment, humiliation, stress, anxiety and mental anguish.

103.    As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic harm.

104.    Defendant's unlawful discriminatory actions in violation of Section 1981 were intentional or done with reckless indifference to Plaintiff's rights.

105.    As a result of Defendant's unlawful discriminatory conduct, Plaintiff is entitled to all remedies and relief afforded by Section 1981, including but not limited to declaratory and injunctive relief, compensatory damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

## SECOND CLAIM
### (NYSHRL - Discrimination)

106.    Plaintiff repeats and incorporates all foregoing paragraphs by reference.

107.    At all relevant times, Defendant was Plaintiff's employer as defined by the NYSHRL, N.Y. Exec. Law § 292(5).

108.     Defendant discriminated against Plaintiff in violation of the NYSHRL, N.Y. Exec. Law § 296 *et seq.*, by, *inter alia*, terminating Plaintiff's employment because of his sex, race, and/or color as described herein.

109.     As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, loss of self-esteem and self-confidence, and emotional pain and suffering.

110.     As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation, and benefits.

111.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL or were done with reckless disregard for Plaintiff's rights.

112.     As a result of Defendant's unlawful discriminatory conduct, Plaintiff is entitled to all remedies and relief afforded the NYSHRL, including but not limited to declaratory and injunctive relief, monetary damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### (NYCHRL - Discrimination)

113.     Plaintiff repeats and incorporates all foregoing paragraphs by reference.

114.     At all relevant times, Defendant was Plaintiff's employer for purposes of the NYCHRL.

115.    Defendant discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, terminating Plaintiff's employment because of his sex, race, and/or color as described herein.

116.    As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, loss of self-esteem and self-confidence, and emotional pain and suffering.

117.    As a direct and proximate result of Defendant's unlawful and willful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation, and benefits.

118.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL or were done with reckless disregard for Plaintiff's rights.

119.    As a result of Defendant's unlawful discriminatory conduct, Plaintiff is entitled to all remedies and relief afforded the NYSHRL, including but not limited to declaratory and injunctive relief, monetary damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.      declare that Defendant's actions as described in this Complaint violated Section 1981, the NYSHRL, and the NYCHRL;

b.      enjoin and permanently restrain Defendant's violations of Section 1981, the NYSHRL, and the NYCHRL;

      c.        order Defendant to reinstate Plaintiff to his position;

      d.       award Plaintiff back pay, front pay, and liquidated damages;

      e.       award Plaintiff compensatory damages for emotional distress, pain, and suffering;

      f.        award Plaintiff punitive damages;

      g.       award Plaintiff his reasonable attorneys' fees and expenses;

      h.       award Plaintiff pre- and post-judgment interest;

      i.        award Plaintiff such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated:  August 29, 2023
        New York, New York

PECHMAN LAW GROUP PLLC

By: _____
    Louis Pechman
    PECHMAN LAW GROUP PLLC
    488 Madison Avenue, 17th Floor
    New York, New York 10022
    Tel.: (212) 583-9500
    pechman@pechmanlaw.com